UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AXIA NETMEDIA CORPORATION<br><br>Plaintiff,<br><br>KCST, USA, INC.<br><br>Plaintiff Intervenor<br><br>v.<br><br>MASSACHUSETTS TECHNOLOGY PARK CORPORATION d/b/a MASSACHUSETTS TECHNOLOGY COLLABORATIVE<br><br>Defendant. | CIVIL ACTION<br><br>NO. 4:17-CV-10482-TSH |

**MEMORANDUM AND ORDER ON DEFENDANT MASSACHUSETTS TECHNOLOGY PARK CORPORATION'S MOTION FOR TEMPORARY RESTRAINING ORDER (Docket No. 11)**

**April 24, 2017**

**HILLMAN, D.J.**

Defendant Massachusetts Technology Park Corporation d/b/a Massachusetts Technology Collaborative ("MTC") filed this motion seeking a temporary restraining order requiring Plaintiff Axia NetMedia Corporation ("Axia NetMedia") to perform its obligations under the parties' Guaranty Agreement while the parties resolve a breach of contract dispute. Having heard argument and received evidence on the Motion for a Temporary Restraining Order (Docket No. 11), MTC's motion for temporary restraining order is **_granted_**.

1

**Background**

MTC is an independent public instrumentality of the Commonwealth of Massachusetts. Through state and federal grants, MTC built and owns the MassBroadband 123 network ("123 Network"). The 123 Network is comprised of over 1200 miles of fiber optic cable infrastructure, which connects more than 120 communities in Central and Western Massachusetts. The 123 Network is used by numerous agencies serving critical public safety functions, including police and emergency services, as well as thousands of other users and customers in Central and Western Massachusetts.

On February 25, 2011, MTC entered into an Agreement for Network Operator Services ("Network Operator Agreement") with Axia NGNetworks USA, Inc. ("Axia US"), a wholly-owned subsidiary of Axia NetMedia. The Network Operator Agreement is a 10-year public services contract, under which MTC agreed to build and install the 123 Network, and Axia US agreed to market, maintain, service, and operate the network, as well as collect revenues, pay its expenses, and make fixed payments to MTC. On the same date, MTC also entered into a Guaranty Agreement with Axia NetMedia, whereby Axia NetMedia guaranteed the performance and payment obligations of Axia US, up to $4 Million. Section 2.1 of the Guaranty provides, in the event of a default by Axia US in any of its payment and performance obligations under the Network Operator Agreement, Axia NetMedia

> (a) shall make all such payments and perform all such obligations of the Network Operator, as described in and in accordance with the terms of the Network Operator Agreement, and as such obligations may be changed in accordance with the terms of the Network Operator Agreement (the "Guaranteed Obligations"); and
> (b) shall fully and punctually pay and discharge, as the same become due and payable, any and all costs, expenses and liabilities for or in connection with the Guaranteed Obligations, including, but not limited to, the costs of causing the substituted performance of the Guaranteed Obligations.

> This guaranty is limited to and capped at the amount of Four Million ($4,000,000) US Dollars, and should Guarantor advance to MTC funds up to said amount, Guarantor shall have no further obligation or liability under this Agreement.

Dkt. #23-3. To date, Axia NetMedia has not made any payments to MTC under the Guaranty.

In July 2014, after indications from Axia US that it intended to stop making payments to, or on behalf of, MTC, until certain disputes between the parties were resolved, MTC commenced litigation in Massachusetts Superior Court and obtained a TRO and preliminary injunction requiring Axia US to perform its obligations pursuant to the "Continuing Performance" provision of the Network Operating Agreement. This provision required the parties to continue performing all obligations under the Network Operating Agreement while their dispute was being resolved.

*Section 214 Authorization*

Operation of a telecommunications network requires authorization from the Federal Communications Commission ("FCC") pursuant to Section 214 of the Communications Act of 1934. Once a network operator has obtained Section 214 authorization, it may not terminate or transfer the authorization without FCC approval.

In early 2016, Axia NetMedia announced that it was being acquired by Partners Group AG, a Swiss investment firm. To facilitate this acquisition, Axia NetMedia sought to transfer the Section 214 authorization from its subsidiary, Axia US, into the Axia NGNetworks Trust ("the Trust"). Axia NetMedia is the sole beneficiary of the Trust. On June 22, 2016, Axia NetMedia, Axia US and the Trust filed a joint application with the FCC for approval of an agreement whereby the Trust would acquire all issued and outstanding stock of Axia US, and its trustee, FSM Capital Management, would assume control of the day-to-day operation of Axia US. After a period of public notice, the FCC granted transfer of the Section 214 Authorization from Axia US to the Trust

3

on July 29, 2016. MTC alleges that the Network Operating Agreement required MTC's written consent prior to any such transfer, which was never sought. Because MTC's consent was not sought, MTC did not learn of the application to transfer Section 214 authorization until after it had been approved by the FCC, and therefore did not file a petition with the FCC to deny the transaction, or otherwise oppose the application for transfer, during the public notice period. MTC filed a petition with the FCC in November 2016 to transfer the Section 214 from the Trust back to Axia USA, however, that petition was denied.

As part of the transfer of its Section 214 authorization to the Trust, Axia US entered into a Transitional Services Agreement with Axia SuperNet Ltd. and Axia Connect Ltd., wholly-owned subsidiaries of Axia NetMedia, which was approved by the FCC. Under the Transitional Services Agreement, Axia SuperNet Ltd. and Axia Connect Ltd. provide the Trust with technical, administrative, and operational support services required to operate the network.

In February 2017, Axia US changed its name to KCST USA, Inc. ("KCST"), and on March 22, 2017, filed for Chapter 11 bankruptcy protection. On the same date, March 22, 2017, Axia NetMedia filed the instant lawsuit seeking declaratory judgment that the Guaranty is unenforceable as a result of MTC's breach of the Network Operating Agreement with KCST, and MTC's breach of the implied covenant of good faith and fair dealing in the Network Operating Agreement with KCST and in the Guaranty Agreement with Axia NetMedia. Axia NetMedia further seeks declaratory judgment that the Guaranty is void because Axia NetMedia's performance of obligations under the Guaranty would violate federal law and FCC regulations, as it would require Axia NetMedia to "operate" the 123 Network without the requisite Section 214 Authorization.

On March 23, 2017, triggered by KCST's bankruptcy petition, MTC provided written notice of an Event of Default to Axia NetMedia and made a demand under the Guaranty, but Axia NetMedia has not responded to that demand.

Section 4.6 of the Guaranty Agreement executed by Axia NetMedia and MTC provides:

> **If the parties fail to resolve any dispute between them through mediation, or are unable to convene mediation within 60 days of first attempting to do so, then, at MTC's sole discretion, MTC may file a demand for arbitration** by the American Arbitration Association in its office serving Boston, Massachusetts, in accordance with the rules for Commerical Arbitration in effect on the date of the Agreement providing the most expedited procedures available, and any such arbitration may be consolidated with an arbitration proceeding between MTC and the Network Operator. **Except to the extent MTC elects arbitration as the method of dispute resolution for a given dispute**, all disputes shall be resolved by litigation in a court serving Middlesex County, Massachusetts, except that, if suit is filed in state court and is not removed to federal court, the parties shall use all reasonable efforts to obtain acceptance of such law suit in the Business Law Session of the Massachusetts Superior Courts. **All other provisions relating to dispute resolution or arbitration contained in the Network Operator Agreement are incorporated herein by reference.**

Compl. Ex. B, at § 4.6 (emphasis added). The relevant section of the Network Operator Agreement is Section 11.2, entitled "Continued Performance," which provides

> The Parties agree to continue performing their respective obligations under the Agreement (including the Wholesale Customer contracts and SLAs) while the dispute is being resolved unless and until such obligations are terminated or expire in accordance with the provisions of this Agreement, or unless otherwise directed by MTC.

Dkt. #23-2, at § 11.2. On March 29, 2017, MTC filed a motion to compel Axia NetMedia to arbitrate the claims raised in its Complaint in accordance with the dispute resolution terms of the Guaranty Agreement.

**Discussion**

In deciding a motion for a temporary restraining order, "a district court weighs four factors: (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." *Jean v. Massachusetts State Police*, 492 F.3d 24, 26–27 (1st Cir. 2007); *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 640 F. Supp. 1159, 1160 (D. Mass. 1986).

*A. Bankruptcy Stay*

As an initial matter, Axia NetMedia and KCST assert that the injunctive relief MTC seeks would violate Section 362(a)(3) of the Bankruptcy Code, which protects the debtor from "any act to obtain possession of property of the estate or to exercise control over property of the estate." Axia NetMedia and KCST assert that, because contractual relationships are considered property of the debtor's estate, granting MTC's requested injunctive relief would interfere with KCST's equitable interests and rights to operate the 123 Network under the Network Operating Agreement while it is under Chapter 11 bankruptcy protection, in violation of Section 362. However, enforcement of a third-party guarantee is not precluded by an automatic bankruptcy stay. *See, e.g.*, *In re Colbran*, LLC, 475 B.R. 289, 299 (Bankr. D. Mass. 2012) ("[The creditor] may freely pursue those guarantors as the automatic stay does not apply to them."). "[C]ommon sense dictates that [a] guarantor remain fully liable even when the principle debtor seeks relief under the Bankruptcy Code. After all, what good is a guaranteed [contract] if the guarantor escapes liability when the debtor does?" *In re Mayan Networks Corp.*, 306 B.R. 295, 300 (B.A.P. 9th Cir. 2004) (quoting *Bel-Ken Assocs. Ltd. P'ship v. Clark*, 83 B.R. 357, 359 (D. Md.

1988)). Accordingly, KCST's bankruptcy stay does not shield Axia NetMedia from performing its obligations under the Guaranty.

### B. *Likelihood of Success on the Merits*

Axia NetMedia asserts that MTC cannot show it is likely to succeed on the merits of its claims because i) the "Continued Performance" provision of the Network Operator Agreement was not incorporated by reference into the Guaranty, and ii) Axia NetMedia is excused from performing under the Guaranty because MTC materially breached the Network Operating Agreement and the implied covenant of good faith and fair dealing in both the Network Operating Agreement and the Guaranty.

"Under Massachusetts law, the interpretation of a contract 'is ... a matter of law for the court.'" *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 231 (1st Cir. 2013) (quoting *Artuso v. Vertex Pharm., Inc.*, 637 F.3d 1, 5–6 (1st Cir. 2011)). "The court interprets a contract that is free from ambiguity according to its plain meaning." *S. Union Co. v. Dep't of Pub. Utilities*, 458 Mass. 812, 820, 941 N.E.2d 633, 640 (2011). "Contract language is ambiguous 'only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'" *Id.* (quoting *Citation Ins. Co. v. Gomez*, 426 Mass. 379, 381, 688 N.E.2d 951 (1998)). "However, an ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other." *Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc.*, 419 Mass. 462, 466, 645 N.E.2d 1165, 1168 (1995).

Axia NetMedia asserts that all "critical obligations" agreed to by the parties were set forth in Article II of the Guaranty, entitled "Covenants and Agreements." It claims that Section 4.6 was never intended to provide any additional covenant or agreement, and that incorporating

the "Continued Performance" provision by reference into the Guaranty creates ambiguities. In support of its assertion, Axia NetMedia points to the placement of the language incorporating by reference the dispute resolution provisions of the Network Operator Agreement under Section 4.6 of the Guaranty, entitled "Governing Law, Jurisdiction, Venue and Forum." is evidence that Axia NetMedia never agreed to perform any further obligations under the "Dispute Resolution" provisions of the Network Operator Agreement. However, this contention is belied by the fact that the bulk of the language in Section 4.6 addresses the resolution of disputes between Axia NetMedia and MTC. The two sentences that precede the incorporation by reference provision outline what will happen "[i]f the parties fail to resolve any dispute between them through mediation," and how disputes between the parties will be resolved in the event MTC does not elect arbitration. While the section heading does not include the phrase "dispute resolution," the substance of the paragraph clearly details how the parties intended to resolve disputes.

Further, while Axia NetMedia suggests MTC is picking and choosing which dispute resolution provisions are incorporated by reference into the Guaranty, and points out that the Guaranty provides for particular dispute resolution procedures that contradict those in the Network Operator Agreement, the specific language of Section 4.6 of the Guaranty carved out these specific variations to the dispute resolution process, and clearly stated that the incorporation by reference was for "[a]ll *other* provisions relating to dispute resolution…." I find no ambiguity in the language of Section 4.6, and give plain meaning to its terms – all other dispute resolution provisions of the Network Operating Agreement, including Section 11.2, "Continued Performance," are incorporated into the Guaranty.

Axia NetMedia further contends that, because MTC only delivered 70% of the network it promised, MTC was in material breach of the Network Operating Agreement, thus excusing

8

Axia NetMedia from any obligations it may have had as guarantor. However, because MTC chose to exercise its contractual right to resolve this dispute by arbitration, the dispute resolution provisions of the Network Operator Agreement, including Section 11.2, "Continued Performance," incorporated by reference into the Guaranty Agreement as discussed above, preclude the argument that Axia NetMedia is excused from performance under the Guaranty at this time.

Consequently, I find that MTC has shown a likelihood of success on the merits of its claim that Axia NetMedia is obligated to comply with the "Continued Performance" provision that was incorporated by reference into the Guaranty Agreement, and is therefore obligated to continue performing those obligations until they terminate or expire, during the pendency of any dispute between the parties concerning the Guaranty, for the duration of this temporary restraining order.

*C. Risk of Irreparable Harm*

"Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined." *Massachusetts Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness of Com. of Massachusetts*, 649 F.2d 71, 74 (1st Cir. 1981) (citing *Parks v. Dunlop*, 517 F.2d 785 (5th Cir. 1975)). "A preliminary injunction will not be issued simply to prevent a mere possibility of injury. A presently existing, actual threat must be shown." *Id.*

Axia NetMedia claims that MTC faces no irreparable harm because KCST is operating the network in the normal course of business without interruption of service via a post-petition loan from Axia NetMedia. In addition, Axia NetMedia asserts that MTC has an adequate remedy at

law because its concerns can be resolved by money damages – in particular, that MTC can collect on its $4 Million guarantee in the event an arbitrator determines that Axia NetMedia is not excused from its contractual obligations under the Guaranty as a result of MTC's alleged breach.

MTC argues that a serious risk of irreparable harm exists because KCST, due to its bankruptcy, is not fully performing its obligations under the Network Operator Agreement, creating a serious risk of operation shutdown. Specifically, vendors supplying critical goods and services to the 123 Network, and the owners of property rights upon which the continued operation of the Network depends, are not being paid past-due amounts that KCST is required to timely pay under the Network Operator Agreement.

MTC has shown a presently existing, clear threat of injury, as it has received notices of default from at least two key vendors. Critically, MTC received notice from Verizon stating that "failure to pay your bill constitutes a default which gives Verizon the right to terminate this agreement and require any of your facilities be removed from our poles and conduit at your cost." Removal of the 123 Network's fiber optic cable from utility poles would cause an immediate shutdown of the 123 Network. Such a shutdown would cut off internet to significant areas of Central and Western Massachusetts, severely damage the reputation of the 123 Network in the marketplace, and threaten the viability and existence of the 123 Network. Money damages would therefore be an inadequate remedy for MTC, and injunctive relief requiring Axia NetMedia to perform its obligations under the Guaranty is appropriate.

Moreover, Axia NetMedia has publicly disavowed its obligation to perform under the Guaranty, thus depriving MTC of its bargained-for right for "Continued Performance" of the Guaranty during this period of dispute resolution. This loss of MTC's bargained-for negotiating position would also not be remedied by final judgment in its favor. Accordingly, I find that MTC

has demonstrated a serious risk of irreparable harm in the absence of a temporary restraining order requiring Axia NetMedia to continue to perform its obligations under the Guaranty.

### D. Balance of Equities

The balance of hardships tips considerably in favor of MTC. As discussed above, Axia NetMedia agreed to dispute resolution terms which required it to continue to perform its obligations under the Guaranty while any dispute between the parties was ongoing. Thus, granting the temporary restraining order only requires Axia NetMedia to do what it agreed to do in the Guaranty. On the other hand, MTC stands to suffer substantial, irreparable harm if the injunctive relief sought is not granted, including shutdown of the 123 Network, permanent damage to the viability of the 123 Network, and loss of a bargained-for right to negotiate under the status quo.

### E. Public Interest

The public interest clearly favors Axia NetMedia being ordered to immediately comply with its Guaranty obligations. Critical public safety functions, including police and emergency services, and thousands of other users and customers in Central and Western Massachusetts, utilize and depend on the 123 Network for 24-hour per day, 7 days per week operation. Axia NetMedia assured these operations under the Guaranty.

### F. FCC and the Communications Act of 1934

Axia NetMedia argues that it is unable to perform its obligations under the Guaranty because its transfer of Axia US into the Trust has rendered its own operation of the 123 Network a violation of federal law and FCC regulation, as Axia NetMedia now lacks the requisite Section

214 Authorization from the FCC to operate the network. However, as Axia Connect, Ltd. and Axia SuperNet, Ltd., both wholly-owned subsidiaries of Axia NetMedia, are currently operating the 123 Network pursuant to the FCC-approved Transitional Services Agreement, I have addressed this issue in my Order by specifically requiring that Axia NetMedia simply continue providing services through these subsidiaries pursuant to the Transitional Services Agreement as it is already doing, and has been doing since the transfer of the Section 214 Authorization in July 2016. Axia NetMedia has not shown that its satisfaction of KCST's payment obligations pursuant to the Guaranty Agreement would violate federal law or regulation.

Finally, Axia NetMedia argues that MTC's present motion is barred by *res judicata* because the FCC's denial of MTC's motion for reconsideration was its final judgment with regards to KCST's operation of the 123 Network. However, I disagree with Axia NetMedia's assertion that the FCC was addressing "the exact same claim" that MTC presents here. The FCC's decision as to who holds the Section 214 Authorization is a distinct claim, separate from the scope and enforceability of Axia NetMedia's contractual obligations under the Guaranty.

## ORDER

NOW, THEREFORE, based on this Court's finding that Axia NetMedia is required to continue to perform its obligations under the Guaranty Agreement during the pendency of any dispute between the parties,

IT IS HEREBY ORDERED that,

    a.    Axia NetMedia shall continue to provide, through its affiliates Axia SuperNet Ltd. and Axia Connect Ltd., the same level of service to MTC's 123 Network that those affiliates are

currently providing, including all the technical, administrative, and operational support services they are currently providing for the 123 Network; and

      b.      Axia NetMedia shall timely pay, and continue to timely pay, all invoices sent to it by MTC concerning the 123 Network, including third party invoices and MTC invoices, in the same manner (and to the same payees) that those types of invoices were being paid prior to the filing of bankruptcy by KCST, and promptly pay any such invoices that have already been sent to it by MTC but have not yet been paid as of this date, or are past due.

      c.      The Court is not requiring MTC to post a bond at this time. However, MTC shall file, under seal with this court, under the pains and penalties of perjury, a current financial statement by close of business on May 1, 2017.

      d.      This Temporary Restraining Order will expire at 11:59pm on May 8, 2017, and may be extended by the Court for good cause shown.

## Conclusion

For the reasons set forth above, Defendant's motion for temporary restraining order (Docket No. 11) is ***granted.***

**SO ORDERED.**

                                                        ***/s/ Timothy S. Hillman***
                                                        **TIMOTHY S. HILLMAN**
                                                        **DISTRICT JUDGE**