UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AXIA NETMEDIA CORPORATION | ) | |
| Plaintiff, | ) ) ) | CIVIL ACTION |
| KCST, USA, INC. | ) ) | NO. 4:17-CV-10482-TSH |
| Plaintiff Intervenor | ) ) ) | |
| v. | ) ) ) | |
| MASSACHUSETTS TECHNOLOGY PARK CORPORATION d/b/a MASSACHUSETTS TECHNOLOGY COLLABORATIVE | ) ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM AND ORDER ON DEFENDANT MASSACHUSETTS TECHNOLOGY PARK CORPORATION'S MOTION FOR PRELIMINARY INJUNCTION (Docket No. 11) AND MOTION TO COMPEL ARBITRATION (Docket No. 10)**

**May 18, 2017**

**HILLMAN, D.J.**

Defendant Massachusetts Technology Park Corporation d/b/a Massachusetts Technology Collaborative ("MTC") filed this motion seeking to compel Plaintiff Axia NetMedia Corporation ("Axia NetMedia") to arbitrate the contractual disputes that form the basis of the present action (Docket No. 10), and seeking a preliminary injunction requiring Axia NetMedia to perform its obligations under the parties' Guaranty Agreement while the parties resolve their various

contractual disputes. For the reasons outlined below, MTC's motion to compel arbitration is ***denied***, without prejudice, and MTC's motion for preliminary injunction is ***granted***.

## Background

MTC is an independent public instrumentality of the Commonwealth of Massachusetts. Through state and federal grants, MTC built and owns the MassBroadband 123 network ("123 Network"). The 123 Network is comprised of over 1200 miles of fiber optic cable infrastructure, which connects more than 120 communities in Central and Western Massachusetts. The 123 Network is used by numerous agencies serving critical public safety functions, including police and emergency services, as well as thousands of other users and customers in Central and Western Massachusetts.

On February 25, 2011, MTC entered into an Agreement for Network Operator Services ("Network Operator Agreement") with Axia NGNetworks USA, Inc. ("Axia U.S."), a wholly-owned subsidiary of Axia NetMedia. The Network Operator Agreement is a 10-year public services contract, under which MTC agreed to build and install the 123 Network, and Axia U.S. agreed to market, maintain, service, and operate the network, as well as collect revenues, pay its expenses, and make fixed payments to MTC. On the same date, MTC also entered into a Guaranty Agreement with Axia NetMedia, whereby Axia NetMedia guaranteed the performance and payment obligations of Axia U.S., up to $4 Million. The same individual, Art Price, executed both the Network Operator Agreement and the Guaranty Agreement on behalf of Axia U.S. and Axia NetMedia, respectively.

Section 2.1 of the Guaranty provides, in the event of a default by Axia U.S. in any of its payment and performance obligations under the Network Operator Agreement, Axia NetMedia

> (a) shall make all such payments and perform all such obligations of the Network Operator, as described in and in accordance with the terms of the Network Operator Agreement, and as such obligations may be changed in accordance with the terms of the Network Operator Agreement (the "Guaranteed Obligations"); and
> (b) shall fully and punctually pay and discharge, as the same become due and payable, any and all costs, expenses and liabilities for or in connection with the Guaranteed Obligations, including, but not limited to, the costs of causing the substituted performance of the Guaranteed Obligations. This guaranty is limited to and capped at the amount of Four Million ($4,000,000) US Dollars, and should Guarantor advance to MTC funds up to said amount, Guarantor shall have no further obligation or liability under this Agreement.

Dkt. #23-3.

In July 2014, after indications from Axia U.S. that it intended to stop making payments to, or on behalf of, MTC, until certain disputes between the parties were resolved, MTC commenced litigation in Massachusetts Superior Court and obtained a TRO and preliminary injunction requiring Axia U.S. to perform its obligations pursuant to the "Continuing Performance" provision of the Network Operator Agreement. This provision required the parties to continue performing all obligations under the Network Operator Agreement while their dispute, which centered on Axia U.S.'s complaint that MTC delivered only 944 of 1392 operational "Community Anchor Institutions" it alleges were promised under the Network Operator Agreement, was being resolved. A "Community Anchor Institution" is defined by the National Telecommunications and Information Administration to include, *inter alia*, public safety entities, libraries, schools, state offices, and healthcare facilities. The Network Operator Agreement defined "Community Anchor Institution" to be "any one of the organizations and agencies identified in Exhibit A hereto, ***as the same may be revised from time to time in MTC's sole discretion up until the Commencement Date***." Docket No. 1-1, Section 2.7 (emphasis added).

*Section 214 Authorization*

Operation of a telecommunications network requires authorization from the Federal Communications Commission ("FCC") pursuant to Section 214 of the Communications Act of 1934. Once a network operator has obtained Section 214 Authorization, it may not terminate or transfer the Authorization without FCC approval.

In early 2016, Axia NetMedia announced that it was being acquired by Partners Group AG, a Swiss investment firm. To facilitate this acquisition, Axia NetMedia sought to transfer the Section 214 Authorization from its subsidiary, Axia U.S., into the Axia NGNetworks Trust ("the Trust"). This avoided the added federal government scrutiny that would otherwise have been triggered by the acquisition of the Section 214 Authorization by a foreign corporation. Axia NetMedia is, nevertheless, the sole beneficiary of the Trust.

On June 22, 2016, Axia NetMedia, Axia U.S. and the Trust filed a joint application with the FCC for approval of an agreement whereby the Trust would acquire all issued and outstanding stock of Axia U.S., and its trustee, FSM Capital Management, would assume control of the day-to-day operation of Axia U.S. After a period of public notice, the FCC granted transfer of the Section 214 Authorization from Axia U.S. to the Trust on July 29, 2016. MTC alleges that the Network Operator Agreement required MTC's written consent prior to any such transfer, which was never sought. Because MTC's consent was not sought, MTC did not learn of the application to transfer Section 214 Authorization until after it had been approved by the FCC, and therefore did not file a petition with the FCC to deny the transaction, or otherwise oppose the application for transfer, during the public notice period. MTC filed a petition with the FCC in November 2016 to transfer the Section 214 Authorization from the Trust back to Axia U.S., however, that petition was denied because, *inter alia*, MTC failed to "to demonstrate that the Trust plans to default on

Axia U.S.'s obligations, liquidate the company, or otherwise jeopardize the continued operation of MTC's network by Axia U.S." Docket No. 23-9, ¶12.

As part of the transfer of its Section 214 Authorization to the Trust, Axia U.S. entered into a Transitional Services Agreement with Axia SuperNet Ltd. and Axia Connect Ltd., wholly-owned subsidiaries of Axia NetMedia, which was approved by the FCC. Under the Transitional Services Agreement, Axia SuperNet Ltd. and Axia Connect Ltd. provide the Trust with technical, administrative, and operational support services required to operate the network.

*Current Proceedings*

In February 2017, Axia U.S. changed its name to KCST USA, Inc. ("KCST"), and on March 22, 2017, filed for Chapter 11 bankruptcy protection. On the same date, March 22, 2017, Axia NetMedia filed the instant lawsuit seeking declaratory judgment that the Guaranty is unenforceable as a result of MTC's breach of the Network Operator Agreement with KCST, and MTC's breach of the implied covenant of good faith and fair dealing in the Network Operator Agreement with KCST and in the Guaranty Agreement with Axia NetMedia. Axia NetMedia further seeks declaratory judgment that the Guaranty is void because Axia NetMedia's performance of obligations under the Guaranty would violate federal law and FCC regulations, as it would require Axia NetMedia to "operate" the 123 Network without the requisite Section 214 Authorization.

On March 23, 2017, triggered by KCST's bankruptcy petition, MTC provided written notice of an Event of Default to Axia NetMedia and made a demand under the Guaranty.

Section 4.6 of the Guaranty Agreement executed by Axia NetMedia and MTC provides:

> **If the parties fail to resolve any dispute between them through mediation, or are unable to convene mediation within 60 days of first**

> **attempting to do so, then, at MTC's sole discretion, MTC may file a demand for arbitration** by the American Arbitration Association in its office serving Boston, Massachusetts, in accordance with the rules for Commercial Arbitration in effect on the date of the Agreement providing the most expedited procedures available, and any such arbitration may be consolidated with an arbitration proceeding between MTC and the Network Operator. **Except to the extent MTC elects arbitration as the method of dispute resolution for a given dispute**, all disputes shall be resolved by litigation in a court serving Middlesex County, Massachusetts, except that, if suit is filed in state court and is not removed to federal court, the parties shall use all reasonable efforts to obtain acceptance of such law suit in the Business Law Session of the Massachusetts Superior Courts. **All other provisions relating to dispute resolution or arbitration contained in the Network Operator Agreement are incorporated herein by reference.**

Compl. Ex. B, at § 4.6 (emphasis added). The relevant section of the Network Operator Agreement is Section 11.2, entitled "Continued Performance," which provides

> The Parties agree to continue performing their respective obligations under the Agreement (including the Wholesale Customer contracts and SLAs) while the dispute is being resolved unless and until such obligations are terminated or expire in accordance with the provisions of this Agreement, or unless otherwise directed by MTC.

Dkt. #23-2, at § 11.2. On March 29, 2017, MTC filed a motion to compel Axia NetMedia to arbitrate the claims raised in its Complaint in accordance with the dispute resolution terms of the Guaranty Agreement. After this Court granted MTC's motion for a temporary restraining order on April 24, 2017, MTC formally requested that Axia NetMedia participate in mediation, if it could be convened within 60 days, pursuant to Section 4.6 of the Guaranty. *See* Letter from Robert Kaler, counsel for MTC, to Brian Voke, counsel for Axia NetMedia (Apr. 28, 2017); Docket No. 93-1.

**Discussion**

In deciding a motion for a preliminary injunction, "a district court weighs four factors: (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." *Jean v. Massachusetts State Police*, 492 F.3d 24, 26–27 (1st Cir. 2007); *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 640 F. Supp. 1159, 1160 (D. Mass. 1986).

*A. Bankruptcy Stay*

As an initial matter, Axia NetMedia and KCST assert that the injunctive relief MTC seeks would violate Section 362(a)(3) of the Bankruptcy Code, which protects the debtor from "any act to obtain possession of property of the estate or to exercise control over property of the estate." Axia NetMedia and KCST assert that, because contractual relationships are considered property of the debtor's estate, granting MTC's requested injunctive relief would interfere with KCST's equitable interests and rights to operate the 123 Network under the Network Operator Agreement while it is under Chapter 11 bankruptcy protection, in violation of Section 362. However, enforcement of a third-party guarantee is not precluded by an automatic bankruptcy stay. *See, e.g.*, *In re Colbran*, LLC, 475 B.R. 289, 299 (Bankr. D. Mass. 2012) ("[The creditor] may freely pursue those guarantors as the automatic stay does not apply to them."). "[C]ommon sense dictates that [a] guarantor remain fully liable even when the principle debtor seeks relief under the Bankruptcy Code. After all, what good is a guaranteed [contract] if the guarantor escapes liability when the debtor does?" *In re Mayan Networks Corp.*, 306 B.R. 295, 300 (B.A.P. 9th Cir. 2004) (quoting *Bel-Ken Assocs. Ltd. P'ship v. Clark*, 83 B.R. 357, 359 (D. Md.

7

1988)). Accordingly, KCST's bankruptcy stay does not shield Axia NetMedia from performing its obligations under the Guaranty.

### B. *Likelihood of Success on the Merits*

Axia NetMedia asserts that MTC cannot show it is likely to succeed on the merits of its claims because i) the "Continued Performance" provision of the Network Operator Agreement was not incorporated by reference into the Guaranty, ii) Axia NetMedia is excused from performing under the Guaranty because MTC materially breached the Network Operator Agreement and the implied covenant of good faith and fair dealing in both the Network Operator Agreement and the Guaranty, and iii) that MTC's breach of the Network Operator Agreement and Guaranty was so severe that it amounts to failure of consideration, warranting rescission of the Guaranty.

"Under Massachusetts law, the interpretation of a contract 'is ... a matter of law for the court.'" *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 231 (1st Cir. 2013) (quoting *Artuso v. Vertex Pharm., Inc.*, 637 F.3d 1, 5–6 (1st Cir. 2011)). "The court interprets a contract that is free from ambiguity according to its plain meaning." *S. Union Co. v. Dep't of Pub. Utilities*, 458 Mass. 812, 820, 941 N.E.2d 633, 640 (2011). "Contract language is ambiguous 'only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'" *Id.* (quoting *Citation Ins. Co. v. Gomez*, 426 Mass. 379, 381, 688 N.E.2d 951 (1998)). "However, an ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other." *Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc.*, 419 Mass. 462, 466, 645 N.E.2d 1165, 1168 (1995).

Axia NetMedia asserts that all "critical obligations" agreed to by the parties were set forth in Article II of the Guaranty, entitled "Covenants and Agreements." It claims that Section 4.6 was never intended to provide any additional covenant or agreement, and that incorporating the "Continued Performance" provision by reference into the Guaranty creates ambiguities. In support of its assertion, Axia NetMedia points to the placement of the language incorporating by reference the dispute resolution provisions of the Network Operator Agreement in Section 4.6 of the Guaranty, entitled "Governing Law, Jurisdiction, Venue and Forum," as evidence that it never intended to create any additional "covenant or agreement" related to dispute resolution.

The bulk of the language in Section 4.6 addresses the resolution of disputes between Axia NetMedia and MTC. The two sentences that precede the incorporation by reference provision outline what will happen "[i]f the parties fail to resolve any dispute between them through mediation," and how disputes between the parties will be resolved in the event MTC does not elect arbitration. Thus, while the section heading does not include the phrase "dispute resolution," the substance of the paragraph clearly details how the parties intended to resolve disputes. Axia NetMedia simply states the conclusion it desires dressed up as an argument. The entire document is an agreement; neither party can pick and choose terms they don't wish to comply with after the fact, based simply on their location within the document.

Further, while Axia NetMedia suggests MTC is picking and choosing which dispute resolution provisions are incorporated by reference into the Guaranty, and points out that the Guaranty provides for particular dispute resolution procedures that contradict those in the Network Operator Agreement, the specific language of Section 4.6 of the Guaranty carved out these specific variations to the dispute resolution process, and clearly stated that the incorporation by reference was for "[a]ll other provisions relating to dispute resolution…."

9

Moreover, "a contract must not, whenever possible, be construed so as to render any of its terms meaningless." *Baybank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F. Supp. 957, 963 (D. Mass. 1991) (citing *Shea v. Bay State Gas Co.*, 383 Mass. 218, 225, 418 N.E.2d 597 (1981)). The Guaranty contains no provision pertaining to continued performance. The Network Operator Agreement does contain a provision pertaining to continued performance. Therefore, the provision in the Network Operator Agreement related to continued performance is an "other provision relating to dispute resolution," and it is incorporated by reference into the Guaranty in concordance with the plain language of that agreement. I find no ambiguity in the language of Section 4.6, and give plain meaning to its terms – all other dispute resolution provisions of the Network Operator Agreement, including Section 11.2, "Continued Performance," are incorporated into the Guaranty.

Axia NetMedia further contends that, because MTC only delivered 70% of the network it promised, MTC was in material breach of the Network Operator Agreement, thus excusing Axia NetMedia from any obligations it may have had as guarantor. However, because MTC chose to exercise its contractual right to resolve this dispute by arbitration, the dispute resolution provisions of the Network Operator Agreement, including Section 11.2, "Continued Performance," incorporated by reference into the Guaranty Agreement as discussed above, preclude the argument that Axia NetMedia is excused from performance under the Guaranty at this time.

Finally, in its supplemental oppositions to MTC's motion for injunctive relief, Axia NetMedia asserts that MTC's failure to construct the network – in particular, delivering only 944 of the 1392 Community Anchor Institutions promised, is so severe a breach of the Network

Operator Agreement and Guaranty as to amount to a failure of consideration for the Guaranty, warranting rescission of the entire Guaranty, and specifically the arbitration provision.

"In the absence of fraud, nothing less than conduct that amounts to an abrogation of the contract, or that goes to the essence of it, or takes away its foundation, can be made a ground for rescission of it by the other party." *Worcester Heritage Soc., Inc. v. Trussell*, 31 Mass. App. Ct. 343, 345, 577 N.E.2d 1009, 1010 (1991) (quoting *Runkle v. Burrage*, 202 Mass. 89, 99, 88 N.E. 573 (1909)). "There is ample authority for refusing rescission where there has been only a breach of contract rather than an utter failure of consideration or a repudiation by the party in breach." *Id.*

Axia NetMedia's argument that the arbitration clause itself can be set aside rests on the argument that the entire agreement is void for failure of consideration. The failure of consideration alleged is that MTC failed to deliver a specific number of Community Anchor Institutions, and that this partial delivery is so damning to the business proposition that it has removed the foundational matter on which the agreement was formed. However, both the Network Operator Agreement and the Guaranty Agreement were executed on the same day by the same Axia representative, and the Network Operator Agreement already anticipated that MTC could change the number of Community Anchor Institutions at its "sole discretion" for some period after the agreement was made. Where the agreements made between the parties already envisage that a parameter of the agreement may be varied, then varying that parameter cannot, by itself, negate the "foundation" or "essence" of the arrangement that the parties contracted to in the first place, and thus does not amount to a failure of consideration so as to warrant rescission.

11

Consequently, I find that MTC has shown a likelihood of success on the merits of its claim that Axia NetMedia is obligated to comply with the "Continued Performance" provision that was incorporated by reference into the Guaranty Agreement, and is therefore obligated to continue performing those obligations until they terminate or expire, during the pendency of any dispute between the parties concerning the Guaranty, for the duration of this injunction.

## C. Risk of Irreparable Harm

"Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined." *Massachusetts Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness of Com. of Massachusetts*, 649 F.2d 71, 74 (1st Cir. 1981) (citing *Parks v. Dunlop*, 517 F.2d 785 (5th Cir. 1975)). "A preliminary injunction will not be issued simply to prevent a mere possibility of injury. A presently existing, actual threat must be shown." *Id.*

Axia NetMedia claims that MTC faces no irreparable harm because KCST is operating the network in the normal course of business without interruption of service via a post-petition loan from Axia NetMedia. In addition, Axia NetMedia asserts that MTC has an adequate remedy at law because its concerns can be resolved by money damages – in particular, that MTC can collect on its $4 Million guarantee in the event an arbitrator determines that Axia NetMedia is not excused from its contractual obligations under the Guaranty as a result of MTC's alleged breach.

MTC argues that a loss of its bargained-for negotiating position constitutes irreparable harm, as it would be forced to renegotiate its Network Operator Agreement with KCST "under the gun" in order to keep the 123 Network operational while the present dispute is being resolved. "[C]ourts … have recognized that injunctive relief is appropriate to preserve the relative leverage

and negotiating positions of the parties in an ongoing dispute." *Zagg, Inc. v. Harmer*, 345 P.3d 1273, 1275 (Utah Ct. App. 2015) (citing *Brady v. National Football League*, 640 F.3d 785, 792–93 (8th Cir.2011) (per curiam); *Trilogy Portfolio Co. v. Brookfield Real Estate Fin. Partners*, LLC, 2012 WL 120201, at *7 (Del.Ch. Jan. 13, 2012). Axia NetMedia's actions pose a real and immediate threat to the continuity and reputation of the services provided on the 123 Network, and thus the value of MTC's asset. Allowing Axia NetMedia to duck the continued performance provision during negotiations creates irreparable harm that would improperly perturb the relative negotiating positions of the parties.

Moreover, while the delinquent invoices that threatened immediate shutdown of the 123 Network in April 2017 were paid upon entry of this court's Temporary Restraining Order on April 24, 2017, there remains an ongoing threat of injury as the Network Operator, KCST, remains in Chapter 11 bankruptcy. Accordingly, I find that MTC has demonstrated a serious risk of irreparable harm in the absence of a preliminary injunction requiring Axia NetMedia to continue to perform its obligations under the Guaranty.

### D. Balance of Equities

The balance of hardships tips considerably in favor of MTC. As discussed above, Axia NetMedia agreed to dispute resolution terms which required it to continue to perform its obligations under the Guaranty while any dispute between the parties was ongoing. Granting the preliminary injunction only requires Axia NetMedia to do what was already envisaged by the Guaranty. In the balance of hardships, Axia NetMedia's only hardship is financial. If it prevails in the dispute resolution process, it will likely emerge whole. On the other hand, MTC stands to suffer substantial, irreparable harm if the injunctive relief sought is not granted, including potential

13

shutdown of the 123 Network, permanent damage to the viability of the 123 Network, and loss of a bargained-for right to negotiate under the status quo. If Axia NetMedia can cause the shutdown of the 123 Network now, then even if MTC prevails in the long run, it remains likely that its asset will be damaged.

### E. Public Interest

The public interest clearly favors Axia NetMedia being ordered to comply with its Guaranty obligations. Critical public safety functions, including police and emergency services, and thousands of other users and customers in Central and Western Massachusetts, utilize and depend on the 123 Network for 24-hour per day, 7 days per week operation.[1] In addition, if high speed internet service in the region is tainted by shutdowns or even the threat of disruption, high tech industry is less likely to locate to these communities. Finally, and more generally, the fact that MTC is a public instrumentality weighs in its favor in the public interest analysis.

### F. FCC and the Communications Act of 1934

Axia NetMedia argues that it is unable to perform its obligations under the Guaranty because its transfer of Axia U.S. into the Trust has rendered its own operation of the 123 Network a violation of federal law and FCC regulation, as Axia NetMedia now lacks the requisite Section 214 Authorization from the FCC to operate the network. However, as Axia Connect, Ltd. and Axia SuperNet, Ltd., both wholly-owned subsidiaries of Axia NetMedia, are currently operating the 123 Network pursuant to the FCC-approved Transitional Services

---

[1] *See, e.g.*, Docket No. 41-1, Letter from Town of Hawley Board of Selectmen to Governor Charlie Baker (Apr. 4, 2017) ("[A] shutdown or interruption of the Middle Mile would result in a complete and long-term Internet/broadband blackout for many municipal installations, including Town Offices, schools and even many local police/fire stations….it is absolutely imperative that this network remains operational.") (emphasis omitted).

14

Agreement, I have addressed this issue in my Order by specifically requiring that Axia NetMedia simply continue providing services through these subsidiaries pursuant to the Transitional Services Agreement as it is already doing, and has been doing since the transfer of the Section 214 Authorization in July 2016. Axia NetMedia has not shown that its satisfaction of KCST's payment obligations pursuant to the Guaranty Agreement would violate federal law or regulation.

Finally, Axia NetMedia argues that MTC's present motion is barred by *res judicata* because the FCC's denial of MTC's motion for reconsideration was its final judgment with regards to KCST's operation of the 123 Network. However, I disagree with Axia NetMedia's assertion that the FCC was addressing "the exact same claim" that MTC presents here. The FCC's decision as to who holds the Section 214 Authorization is a distinct claim, separate from the scope and enforceability of Axia NetMedia's contractual obligations under the Guaranty.

*Motion to Compel Arbitration*

Section 4.6 of the Guaranty conditions MTC's right to pursue arbitration on a failure to resolve the dispute in mediation, or an inability to convene mediation within 60 days of first attempting to do so. After orally declining to mediate the present dispute during the hearing on the motion seeking injunctive relief, MTC sent a letter to Axia NetMedia formally requesting mediation on April 28, 2017. Accordingly, MTC's motion to compel arbitration is denied, without prejudice, as premature.

**ORDER**

NOW, THEREFORE, based on this Court's finding that Axia NetMedia is required to continue to perform its obligations under the Guaranty Agreement during the pendency of any dispute between the parties,

IT IS HEREBY ORDERED that,

a. Axia NetMedia shall continue to provide, through its affiliates Axia SuperNet Ltd. and Axia Connect Ltd., the same level of service to MTC's 123 Network that those affiliates are currently providing, including all the technical, administrative, and operational support services they are currently providing for the 123 Network; and

b. Axia NetMedia shall timely pay, and continue to timely pay, all invoices sent to it by MTC concerning the 123 Network, including third party invoices and MTC invoices, in the same manner (and to the same payees) that those types of invoices were being paid prior to the filing of bankruptcy by KCST, and promptly pay any such invoices that have already been sent to it by MTC but have not yet been paid as of this date, or are past due.

c. Except to the extent otherwise ordered by the Bankruptcy Court, Axia NetMedia shall cooperate with MTC, upon request, to assist in the orderly transfer to a successor Network Operator of the services, functions, responsibilities, tasks and operations currently being provided by its affiliates, Axia SuperNet Ltd. And Axia Connect Ltd., and provide MTC with commercially reasonable services transfer assistance in that regard for a period of one (1) year prior to dissolution of this Order.

d. Except to the extent otherwise ordered by the Bankruptcy Court, Axia NetMedia shall, as part of the service transfer assistance, promptly provide MTC with access to, and the opportunity to copy, all information concerning the Network in its possession, custody or control, including all information and records concerning the Network in the possession, custody or control of its affiliates Axia SuperNet Ltd. and Axia Connect Ltd., except to the extent it is prohibited from doing so by law or under contracts it has with third parties, with the caveat that if disclosable information can be segregated at reasonable cost from information that cannot be disclosed to MTC by law or by contract, then such disclosable information shall be so segregated and disclosed to MTC;

e. This Order is conditioned on MTC posting a bond of $4 Million for the duration of the Injunction.

f. Once Axia NetMedia's payments under the guaranty reach a total of $4,000,000, sections a. and b. of this Order shall no longer have effect.

g. Once Axia NetMedia has provided one year of transfer assistance service to MTC, sections c. and d. of this Order shall no longer have effect. The Parties may seek an adjustment or nullification of this Order at the conclusion of, or as part of, the mediation or arbitration of their underlying dispute.

h. This Order shall dissolve and no longer have any effect once the conditions in sections f. and g. of this order have been met.

## Conclusion

For the reasons set forth above, Defendant's motion to compel arbitration (Docket No. 10) is **_denied_**, and Defendant's motion for preliminary injunction (Docket No. 11) is **_granted._**

**SO ORDERED.**

**_/s/ Timothy S. Hillman_**
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**
