**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| | ) | |
| **AXIA NETMEDIA CORPORATION** | ) | |
| | ) | **CIVIL ACTION** |
| **Plaintiff,** | ) | |
| | ) | **NO. 17-10482-TSH** |
| **KCST, USA, INC.** | ) | |
| | ) | |
| **Plaintiff Intervenor** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **MASSACHUSETTS TECHNOLOGY** | ) | |
| **PARK CORPORATION d/b/a** | ) | |
| **MASSACHUSETTS TECHNOLOGY** | ) | |
| **COLLABORATIVE** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____ )

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO VACATE IN PART**
**AND MODIFY ARBITRATION AWARD AND PLAINITFF'S MOTION TO CONFIRM**
**ARBITRATION AWARD (Docket Nos. 241 & 243)**

**May 28, 2019**

HILLMAN, D.J.

Defendant Massachusetts Technology Park Corporation ("MTC") and Plaintiff Axia NetMedia Corporation ("Axia") submitted their claims to final arbitration. On November 8, 2018, the arbitrator issued his final award. MTC now moves to vacate in part and modify that award and Axia moves to confirm it. For the reasons stated below, MTC's motion (Docket No. 243) is _**granted**_ and Axia's motion (Docket No. 241) is _**denied**_.

**Background**

MTC is an independent public instrumentality of the Commonwealth of Massachusetts. Through state and federal grants, MTC built and owns the MassBroadband 123 network ("123 Network"). The 123 Network is comprised of over 1,200 miles of fiber optic cable infrastructure which connects more than 120 communities in Central and Western Massachusetts. The 123 Network is used by numerous agencies serving critical public safety functions, including police and emergency services, as well as thousands of other users and customers in Central and Western Massachusetts.

On February 25, 2011, MTC entered into an Agreement for Network Operator Services ("NOA") with Axia NGNetworks USA, Inc. ("Axia U.S."), a wholly-owned subsidiary of Axia. The NOA is a 10-year public services contract, under which MTC agreed to build and install the 123 Network, and Axia U.S. agreed to market, maintain, service, and operate the network, as well as collect revenues, pay its expenses, and make fixed payments to MTC. On the same date, MTC also entered into a Guaranty Agreement with Axia, whereby Axia guaranteed the performance and payment obligations of Axia U.S., up to $4 million. The same individual, Art Price, executed both the NOA and the Guaranty Agreement on behalf of Axia U.S. and Axia, respectively.

Section 2.1 of the Guaranty provides, in the event of a default by Axia U.S. in any of its payment and performance obligations under the NOA, that Axia

(a)     shall make all such payments and perform all such obligations of the Network Operator, as described in and in accordance with the terms of the Network Operator Agreement, and as such obligations may be changed in accordance with the terms of the Network Operator Agreement (the "Guaranteed Obligations"); and
(b)     shall fully and punctually pay and discharge, as the same become due and payable, any and all costs, expenses and liabilities for or in connection with the Guaranteed Obligations, including, but not limited to, the costs of causing the substituted performance of the Guaranteed Obligations. This guaranty is limited to and capped at the amount of Four Million ($4,000,000) US Dollars, and should Guarantor advance to MTC funds up to said amount, Guarantor shall have no further obligation or liability under this Agreement.

(Docket No. 23-3, § 2.1).

In July 2014, after indications from Axia U.S. that it intended to stop making payments to, or on behalf of, MTC, until certain disputes between the parties were resolved, MTC commenced litigation in the Massachusetts Superior Court and obtained a TRO and preliminary injunction requiring Axia U.S. to perform its obligations pursuant to the "Continuing Performance" provision of the NOA. This provision required the parties to continue performing all obligations under the NOA while their dispute was resolved. That dispute centered on Axia U.S.'s complaint that MTC delivered only 944 of 1,392 operational Community Anchor Institutions ("CAI"), which it promised under the NOA. A CAI is defined by the National Telecommunications and Information Administration to include, *inter alia*, public safety entities, libraries, schools, state offices, and healthcare facilities. The NOA defined a CAI to be "any one of the organizations and agencies identified in Exhibit A hereto, as the same may be revised from time to time in MTC's sole discretion up until the Commencement Date." (Docket No. 1-1, § 2.7).[1]

In February 2017, Axia U.S. changed its name to KCST USA, Inc. ("KCST"), and on March 22, 2017, filed for Chapter 11 bankruptcy protection. On the same date, Axia filed a lawsuit seeking declaratory judgment that the Guaranty was unenforceable because of MTC materially breached the NOA by failing to build the requisite number of CAIs and, because of that breach, that Axia had no responsibilities under the Guaranty. The First Circuit called this "the underlying dispute." *Axia NetMedia Corp. v. MA Tech. Park Corp.*, 889 F.3d 1, 6 (1st Cir. 2018).

On March 23, 2017, triggered by KCST's bankruptcy petition, MTC provided written notice of an Event of Default to Axia and made a demand under the Guaranty. Section 4.6 of the Guaranty Agreement provides:

---

[1] CAIs operate as hubs of connectivity for extending the network to other customers and are essential to the network's financial viability.

> If the parties fail to resolve any dispute between them through mediation, or are unable to convene mediation within 60 days of first attempting to do so, then, at MTC's sole discretion, MTC may file a demand for arbitration by the American Arbitration Association in its office serving Boston, Massachusetts, in accordance with the rules for Commercial Arbitration in effect on the date of the Agreement providing the most expedited procedures available, and any such arbitration may be consolidated with an arbitration proceeding between MTC and the Network Operator.  Except to the extent MTC elects arbitration as the method of dispute resolution for a given dispute, all disputes shall be resolved by litigation in a court serving Middlesex County, Massachusetts, except that, if suit is filed in state court and is not removed to federal court, the parties shall use all reasonable efforts to obtain acceptance of such law suit in the Business Law Session of the Massachusetts Superior Courts.  All other provisions relating to dispute resolution or arbitration contained in the Network Operator Agreement are incorporated herein by reference.

(Docket No. 1-19, § 4.6).  The relevant section of the NOA is Section 11.2, entitled "Continued Performance," which provides:

> The Parties agree to continue performing their respective obligations under the Agreement (including the Wholesale Customer contracts and SLAs) while the dispute is being resolved unless and until such obligations are terminated or expire in accordance with the provisions of this Agreement, or unless otherwise directed by MTC.

(Docket No. 23-2, § 11.2).

MTC successfully demanded arbitration of the underlying dispute in accordance with the dispute resolution terms of the Guaranty Agreement.  MTC also filed a motion for a preliminary injunction requiring Axia as guarantor to perform KCST's obligations under the NOA while the underlying dispute was in arbitration.  The First Circuit called this dispute "the continued performance dispute." *Axia*, 889 F.3d at 6.  This Court granted MTC's motion for a preliminary injunction for the continued performance dispute while the underlying dispute was in arbitration conditioned on MTC posting a bond of $4 million for the duration of the injunction.

Thereafter, the underlying dispute was resolved in arbitration.  The Arbitrator found that MTC breached the agreement and that the appropriate remedy was "reformation of the NOA fixed

4

*nunc pro tunc* to the date of breach . . . when MTC decided not to make good on adjusting the NOA to meet its failed Network delivery obligations." (Docket No. 242-1, at 27).[2]  Accordingly, the arbitrator reformed the NOA and left the re-written contract "open to KCST to accept or reject." (Docket No. 242-1, at 30).[3]  In addition, the arbitrator held "[t]he Axia Guarantee is no longer valid, nor does it remain in force." (Docket No. 242-2 ¶ 20E).  The arbitrator held that the Guaranty was void as a result of MTC's breach of the NOA and because MTC failed to honor its obligation under section 5.2.7 to adjust the NOA terms in a commercially reasonable fashion. (Docket No. 242-1, at 18, 27).

## Standard of Review

Where parties agree to submit a dispute to binding arbitration, "it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept.  Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 37-38, 108 S.Ct. 364 (1987).  Accordingly, a "district court's review of arbitration awards must be 'extremely narrow and exceedingly deferential.'" *Bull HN Info. Sys. Inc. v. Hutson*, 229 F.3d 321, 330 (1st Cir. 2000) (quoting *Wheelabrator Envirotech Operating Servs., Inc. v. Mass. Laborers Dist. Council Local 1144*, 88 F.3d 40, 43 (1st Cir. 1996)); *see also Teamsters Local Union No. 42 v. Supervalu, Inc.*, 212 F.3d 59, 61 (1st Cir. 2000) (noting that arbitral awards are "nearly impervious to judicial oversight").

---

[2] As the arbitrator put it, "the breach by MTC . . . went at once to the 'essence' or 'foundation' of the NOA and underlying consideration of the Guarantee, since there was a failure to turn over the contemplated network in material part and to negotiate appropriate new commercial term accordingly." (Docket No. 242-2 ¶ 19).

[3] The new terms in the reformed NOA were "taken from a draft contract prepared by MTC in 2017 for possible use with a potential replacement Network Operator, Holyoke Gas & Electric." (Docket No. 244, at 12).

"That a reviewing court is convinced that the arbitrators committed error—even serious error—does not justify setting aside the arbitral decision.   This remains true whether the arbitrator's apparent error concerns a matter of law or a matter of fact." *Cytyc Corp. v. DEKA Prods. Ltd. P'ship*, 439 F.3d 27, 32 (1st Cir. 2006); *see also Costal Oil of New England, Inc. v. Teamsters Local*, 134 F.3d 466, 469 (1st Cir. 1998) ("[A] court should uphold an award that depends on the arbitrator's interpretation of a [contract] if it can find, within the four corners of the agreement, any plausible basis for that interpretation." (citation omitted)); *Salem Hosp. v. Mass. Nurses Ass'n*, 449 F.3d 234, 238 (1st Cir. 2006) (noting that the task of a court "is to determine whether the arbitrator exceeded his authority by failing to apply the contract in a plausible manner" (citation omitted)).

That said, "[t]here are some exceptions where a court will overturn an arbitral award." *UMass Mem'l Med. Ctr. Inc. v. United Food and Commercial Workers Union*, 527 F.3d 1, 5 (1st Cir. 2008).  Pursuant to the Federal Arbitration Act ("FAA"), a court may vacate an arbitral award where: (1) the award was procured by corruption, fraud, or undue means; (2) there was evidence of partiality or corruption in the arbitrators, or either of them; (3) the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10(a).

In addition, a second ground for vacatur arises under federal common law and permits courts to vacate an award in "manifest disregard of the law." *McCarthy v. Citigroup Global Mkts. Inc.*, 463 F.3d 87, 91 (1st Cir. 2001) (citation omitted).  That is, when an award either "contravenes

the plain language of the applicable contract," or the arbitrator "disregards applicable law." *UMass*, 527 F.3d at 6.  That is, the arbitration award, "must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of . . . justice." *United Paperworkers*, 484 U.S. at 38, 108 S.Ct. 364.[4, 5]

## Discussion

### *1.  Final Awards*

As a preliminary matter, Axia argues that the NOA, which the Guaranty incorporates by reference, prohibits any review of the arbitration award by this Court.  The NOA, in relevant part, provides: "The decision or award of the arbitrator shall be final, binding and non-appealable by the Parties." (Docket No. 1-1, § 11.1.4).

---

[4] "Whether the manifest-disregard doctrine remains good law, however, is uncertain.  A circuit split has developed following the Supreme Court's decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584, 128 S.Ct. 1396 (2008), which held that § 10 of the FAA provides the exclusive grounds under the statute for vacatur of arbitration awards." *Raymond James Financial Servs., Inc. v. Fenyk*, 780 F.3d 59, 64 (1st Cir. 2015) (citation omitted); *see also Bangor Gas Co. v. H.Q. Energy Servs. (U.S.) Inc.*, 695 F.3d 181, 187 & n.3 (1st Cir. 2012) (listing cases).  While the First circuit has "referred to the issue in dicta, [it has] not squarely determined whether [its] manifest disregard case law can be reconciled with *Hall Street*." *Kashner Davidson Securities Corp. v. Mscisz*, 601 F.3d 19, 22 (1st Cir. 2010) (citation omitted); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3, 130 S.Ct. 1758 (2010) (declining to decide whether "manifest disregard" survived *Hall Street* "as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10").

Because I find that the arbitrator exceeded his authority under section 10, I need not assess whether the manifest-disregard doctrine remains available to challenge arbitral awards.

[5] Pursuant to Section 11 of the FAA, a court may also modify or correct an arbitration award "to effect its intent and promote justice between the parties" where: (1) there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award; (2) the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted; (3) the award is imperfect in matter of form not affecting the merits of the controversy. 9 U.S.C. § 11.

MTC cites section 11 in its briefing, but it does not proffer any arguments why modification would be appropriate under that section.  MTC only contends that the arbitral award should be "modified so as to confirm the continuing validity and enforceability of the Guaranty." (Docket No. 244, at 24).  Accordingly, the Court will not modify the award.  Moreover, as "9 U.S.C. § 11 provides for correction of 'evident' and 'material' *arithmetic or descriptive* errors," it is not clear that modification would be an appropriate remedy in this case. *Advest, Inc. v. McCarthy*, 914 F.2d 6, 8 n.4 (1st Cir. 1990) (emphasis added).

An award that is "final, binding and non-appealable" can be interpreted two ways. On the one hand, it may be interpreted as foreclosing any judicial review, including on the grounds enumerated in section 10 of the FAA and noted above. 9 U.S.C. § 10(a).[6] On the other hand, it may simply preclude a district court from re-adjudicating the merits. *See Wal-Mart*, 737 F.3d at 1265-66 (noting the two ways that a "binding, non-appealable arbitration" clause might be interpreted).

The First Circuit has not assessed the effect of such provisions on the judicial review of arbitral awards. Several courts have reviewed similar provisions, however, and interpreted them to only preclude review of the merits of the arbitral award. The Eleventh Circuit, for instance, reviewed an agreement which provided for "binding, final, and non-appealable" arbitration and concluded that the clause "does not mean the award cannot be reviewed. It simply means the parties have agreed to relinquish their right to appeal the merits of their dispute; it does not mean the parties relinquish their right to appeal an award resulting from an arbitrator's abuse of authority, bias, or manifest disregard of the law." *Rollins, Inc. v. Black*, 167 Fed.Appx. 798, 799 n.1 (11th Cir. 2006) (citations omitted); *see also Dean v. Sullivan*, 118 F.3d 1170, 1171 (7th Cir. 1997) ("That the arbitration was final and binding does not mean that federal courts will enforce the decision in every case."); *Southco, Inc. v. Reell Precision Mfg. Corp.*, 331 Fed.Appx. 925, 927 (3d Cir. 2009) (observing that, where an arbitration is "final, binding and non-appealable . . . the parties to the contract may not appeal the merits of the arbitration" (emphasis removed) (citing *Tabas v.*

---

[6] The Ninth Circuit held that the statutory text precludes parties from contracting away judicial review under the FAA. *See In re Wal-Mart Wage and Hour Employment Practices Litig.*, 737 F.3d 1262, 1267 (9th Cir. 2013) (concluding that because "the FAA compels the conclusion that the grounds for vacatur of an arbitration award may not be supplemented, it also compels the conclusion that these grounds are not waivable, or subject to elimination by contract"). Because I find that the parties here did not intend to waive review pursuant to the FAA, I need not address whether parties may agree to eliminate all judicial review of arbitral awards.

*Tabas*, 47 F.3d 1280, 1288 (3d Cir. 1995))); *Team Scandia, Inc. v. Greco*, 6 F. Supp. 2d 795, 798 (S.D. Ind. 1998) ("It is presumed that [when parties agree arbitration will be final, binding, and non-appealable] that the parties intended to relinquish their right to appeal the merits of the dispute, not their right to appeal an arbitration award that resulted from the arbitrator's abuse of authority or bias.  Accordingly, judicial review of the arbitrator's award is permissible on the grounds set forth in the FAA.").  In other words, these agreements did not eliminate a court's ability to review the award pursuant to section 10.  Given this backdrop of caselaw interpreting identical language, I find that the parties did not intend to eliminate this Court's ability to review the award pursuant to section 10 of the FAA, especially because the negotiations here were between two sophisticated parties presumably aware of this precedential background.

### 2.  *Res Judicata & Collateral Estoppel*

"A party seeking to invoke the doctrine of collateral estoppel must establish that (1) the issue sought to be precluded in the later action is the same as that involved in the earlier action; (2) the issue was actually litigated; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was essential to the judgment." *Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, 490 F.3d 86, 90 (1st Cir. 2007).  In addition, the doctrine of res judicata "precludes parties from relitigating claims there were or could have been brought in a prior action." *Universal Ins. Co. v. Office of Ins. Com'r*, 755 F.3d 34, 37 (1st Cir. 2014) (citation omitted).

Axia argues that both doctrines prevent MTC from challenging the arbitral award. According to Axia, because "the identical arbitration awards in this case were already affirmed by a prior final judgment in the bankruptcy court involving KCST, MTC and Axia." (Docket No. 262, at 21).  The bankruptcy court confirmed the arbitration award with respect to KCST.  Specifically,

the court concluded "[t]he Network Operator Agreement ("NOA") is valid and enforceable as reformed through the substitution of commercial terms found in Arbitration Exhibit R-169 at paragraphs 4.8 and 4.9, subject to KCST's rights under 11 U.S.C. § 365."

KCST made clear in its motion in the Bankruptcy Court that the "motion does not involve KCST's co-respondent, Axia Net Media Corp. ("Axia").  Confirmation of the final award as to Axia's claims is subject to separate determination by the United States District Court . . . pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9." (Docket No. 271-2, at 2).  Similarly, in its motion to confirm the award in this Court, Axia noted: "This motion does not involve Axia's co-Respondent KCST USA, Inc. who has filed its motion to confirm arbitration award and enter judgement in the United States Bankruptcy Court in Massachusetts." (Docket No. 241, at 1 n.1).

Accordingly, the issue that Axia seeks preclude this Court from reaching is not the same as the issue resolved in the Bankruptcy proceeding.  In addition, confirmation of the award as to Axia's claims neither were nor could have been brought in the prior action.  Therefore, while this Court will not assess whether the arbitrator exceeded his powers by re-writing the NOA insofar as it affects the relationship between MTC and KCST, MTC may move to vacate the award in this Court insofar as it affects its relationship with Axia.

*3.  Vacatur*

MTC argues that the arbitrator acted outside the scope of his authority by rewriting the NOA and providing KCST with the right to enter into that contract moving forward while also "prospectively voiding the Guaranty." (Docket No. 244, at 20).[7]  At the hearing on this motion, MTC's counsel noted that the new, re-written contract is "with a shell entity that is in bankruptcy

---

[7] The arbitrator concluded that the NOA, as re-written by him, is valid and enforceable "subject to such disposition as may be made in the Bankruptcy Court, since it is open to KCST to accept or reject that contract, with its reformed terms, in that forum." (Docket No. 242-1, at 30).  It is the Court's understanding that KCST did accept the reformed terms in the bankruptcy proceeding.

on a major public network that has four more years to go on the contract and no guaranty from the parent." (Docket No. 282, at 22).  Accordingly, MTC contends that the award should be vacated pursuant to 9 U.S.C. § 10(a)(4).

"A party seeking relief under [this] provision bears a heavy burden." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 133 S.Ct. 2064 (2013).  "Because arbitration is simply a matter of contract between the parties, we look to the parties' contract to determine the powers the parties intended to bestow upon the arbitrator." *Eastern Seaboard Const. Co. Inc. v. Gray Const., Inc.*, 553 F.3d 1, 3 (1st Cir. 2008) (quotation marks and citation omitted).  "[T]he sole question for [the court] is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." *Oxford Health*, 569 U.S. at 569, 133 S.Ct. 2064; s*ee also El Dorado Tech. Servs., Inc. v. Union General De Trabajadores de Puerto Rico*, 961 F.2d 317, 319 (1st Cir. 1992) ("[A] court should uphold an award that depends on an arbitrator's interpretation of a[n] . . . agreement if it can find, within the four corners of the agreement, *any plausible basis* for that interpretation." (emphasis added)).

While the arbitrator assumes the role of interpreting the agreement, and although courts are incredibly deferential to the arbitrator's interpretation, "there remains a vaguely defined limit: a reviewing court may still conclude that the arbitrator is re-writing the terms instead of construing them." *Poland Spring Corp. v. United Food & Commercial Workers Intern. Union, AFL-CIO-CLC, Local 1445*, 314 F.3d 29, 37 (1st Cir. 2002) (Boudin, J. concurring) (citing *United Paperworkers*, 484 U.S. at 38, 108 S.Ct. 364).  Put another way, a Court may vacate awards where arbitrators "abandon[ ] their interpretative role," *Oxford Health*, 569 U.S. at 572, 133 S.Ct. 2064, or "act[ ] so far outside the bounds of their authority that they can be said to have dispensed their

'own brand of industrial justice.'" *First State Ins. Co. v. National Cas. Co.*, 781 F.3d 7, 11 (1st Cir. 2015) (quoting *Stolt-Nielsen*, 559 U.S. at 671, 130 S.Ct. 1758).

In the Partial Final Award, the arbitrator concluded:

KCST and Axia prevail on the claim of material breach by MTC in failing to deliver a Network in accordance with the goals and objectives of both parties and failing to honor its obligations under NOA section 5.2.7, in that it did not behave in commercially reasonable fashion through appropriate adjustment of the NOA terms based on that delivery breach, which it unilaterally decided by July 15, 2014.

(Docket No. 242-1 ¶ 48).

Section 5.2.7 of the NOA provides that MTC "shall timely and diligently cooperate to effect the goals, objectives and purposes of this Agreement and to facilitate the performance of the respective duties and obligations of the Parties under this Agreement in a commercially reasonable manner." (Docket No. 1-1, at 69). The arbitrator interpreted Section 5.2.7 as imposing a duty on MTC to adjust the terms of the NOA, which it did not do. Accordingly, the arbitrator "reformed" the NOA "with the substitution of the commercial terms found in 4.8 and 4.9 of R-169." (Docket No. 242-1 ¶ 51). However, in addition to reforming the NOA, the arbitrator held "[t]he Axia Guarantee is no longer valid, nor does it remain in force." (Docket No. 242-2 ¶ 20-E). MTC argues, as it did in arbitration, "that it would have 'insisted' on [a continuation of the Guaranty] in any renegotiation of NOA terms (per specific performance of sections 5.2.7 and 6)." *Id.* ¶ 17. The arbitrator concluded that "MTC advance[d] this position without any citation of record support." *Id.*

MTC argues that the arbitrator acted outside the scope of his authority by re-writing the NOA and then compounded this error by prospectively invalidating the Guaranty, even after MTC paid what was owed under the Guaranty. (Docket No. 244, at 20-21). This Court will not review whether the arbitrator exceeded his power in re-writing the NOA because Axia is not a party to

that contract.  The NOA defines the relationship between MTC and KCST, and the Bankruptcy Court has upheld the arbitral award with respect to KCST.  The NOA, however, also presupposes the validity of the Guaranty in section 12.14.  The Guaranty is a necessary condition for MTC to continue performance under any agreement.  According to section 12.14, the NOA "shall become binding *only upon condition* that Network Operator's parent company, Axia NetMedia Corporation, executes and delivers to MTC a guaranty of obligations of Network Operator hereunder in a form acceptable to MTC, with a limit of liability no less than four million ($4,000,000) U.S. dollars." (Docket No. 1-1, § 12.14) (emphasis added).

In the Court's view, the arbitrator exceeded his powers under the FAA by prospectively voiding the Guaranty while re-writing the terms of the NOA.  First, there is evidence that the parties never intended to bestow this power upon the arbitrator.  *See Eastern Seaboard*, 553 F.3d at 3 ("[W]e look to the parties' contract to determine the powers the parties intended to bestow upon the arbitrator.").  For instance, in its motion to dismiss, KCST noted that "arbitrators do not have the power to re-write the contract." (Docket No. 22-2, at 7 n.2).  In addition, the parties agreed that disputes would be settled in accordance with the rules of Commercial arbitration.[8]  Those rules require that arbitral awards remain "within the scope of the agreement of the parties." Am. Arbitration Ass'n, Commerical Arbitration Rules and Mediation Precures, at R-47(a) (2013), *available at* https://www.adr.org/sites/default/files/Commercial%20Rules.pdf; s*ee also PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*, 400 Fed.Appx. 654, 656 (3d Cir. 2010)

---

[8] The NOA provides that arbitration would be "conducted in accordance with AAA Rules," (Docket No. 23-2, § 11.1.3), which is clarified to "mean the Commercial Arbitration Rules of the American Arbitration Association in effect at the time a demand for arbitration is made." *Id.* § 2.1.  Similarly, the Guaranty provides that disputes would be settled "in accordance with the rules for Commercial Arbitration in effect on the date of the Agreement." (Docket No. 1-19, § 4.6).

("The arbitrators in this case, by . . . rewriting material terms of the contract they purported to implement, went beyond the scope of their authority.").

Moreover, in re-writing the contract, the arbitrator fundamentally altered the relationship between the parties to adhere to his own conception of fairness.  By deleting section 12.14 from the re-written contract, the arbitrator constructed an arrangement that MTC would never have agreed to ex ante.  The arbitrator concluded that "the record was simply devoid of specific persuasive evidence" that "reformation of certain commercial terms necessarily would have been conditioned on a new guarantee from Axia." (Docket No. 242-2 ¶ 18).  The Court disagrees.  First, the necessity of the Guaranty is reflected in the original contractual arrangement.  In fact, in re-writing the NOA and voiding the Guaranty, the arbitrator disregarded section 12.14. *See Amalgamated Transit Union Local No. 1498 v. Jefferson Partners*, 229 F.3d 1198, 1200 (8th Cir. 2000) ("The arbitrator . . . is not free to ignore or abandon the plain language of the [parties' agreement], which would in effect amend or alter the agreement without authority." (quotation marks and citation omitted)).  Further, the necessity of the NOA is also demonstrated by testimony at arbitration.  For instance, MTC's General Counsel Philip Holahan testified that "the guaranty is critical to the operation of the network." (Docket No. 245-18, at 3).  Circumstantial evidence further underscores the importance of the Guaranty.  As noted above, at the hearing on these motions, MTC's counsel noted that the re-written "contract is with a shell entity that is in bankruptcy on a major public network that has four more years to go on the contract and no guaranty from the parent." (Docket No. 282, at 22).

This conclusion is further supported by the language of the Guaranty agreement itself, which the arbitrator seems to have overlooked.  For instance, the agreement notes:

> This Agreement and the liability hereunder shall not be affected or impaired by any compromise, settlement, release, renewal, extension, indulgence, changing or

modification of any of the obligations and liabilities of the Network Operator under the Network Operator Agreement, or by any failure on the part of MTC, its successors or assigns, to realize upon any obligations or labilities of Network Operator.

(Docket 1-19 § 2.3).

An arbitrator exceeds his powers under section 10 when he reforms material terms of a contract so that the agreement conforms with his own sense of equity or justice. *Stolt-Nielsen*, 559 U.S. at 671, 130 S.Ct. 1758 ("[W]hen an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice . . . his decision may be unenforceable" under section 10(4) of the FAA (quotation marks and citation omitted)); *Steward Holy Family Hosp., Inc. v. Mass. Nurses Assoc.*, 350 F. Supp. 3d 7, 14 (D. Mass. 2018) (overturning arbitration award where "the arbitrator was prescribing his own brand of industrial justice in violation of the plain terms of the contract").  Accordingly, I find that the arbitrator exceeded his authority here.

## Conclusion

For the reasons stated above, MTC's motion to vacate in part and modify the arbitration award (Docket No. 243) is ***granted*** and Axia's motion to confirm the award (Docket No. 241) is ***denied***.  The arbitrator's award is ***vacated***.

**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**